**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

BRICKEY R.,[1]                    ) Case No. CV 19-4953-JPR
                                  )
            Plaintiff,            )
                                  ) **MEMORANDUM DECISION AND ORDER**
        v.                        )
                                  )
ANDREW SAUL, Commissioner         )
of Social Security,               )
                                  )
            Defendant.            )
_____  )

**I.   PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security Disability Insurance Benefits ("DIB").  The matter is before the Court on the parties' Joint Stipulation, filed February 3, 2020, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed.

---

[1] Plaintiff's name is partially redacted in line with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1

**II.   BACKGROUND**

Plaintiff was born in 1969.  (Administrative Record ("AR") 132.)  He has a high-school education and worked for more than 17 years as a groundskeeper for the Los Angeles Unified School District.  (See AR 136; see also AR 37 (vocational expert describing Plaintiff's job as "hybrid" of groundskeeper and commercial or institutional cleaner).)  He applied for DIB on April 1, 2016, alleging that he had been unable to work since June 11, 2013, because of "[b]ack [s]train," "[s]pinal [f]usion," and "[k]nee injury."  (AR 132, 135.)  After his claim was denied initially and on reconsideration, he requested a hearing.  (AR 69.)  A hearing was held on March 5, 2018, at which Plaintiff, who was represented by counsel, testified (AR 31, 33-36), as did a vocational expert (AR 36-41).  In a written decision dated May 9, 2018, the ALJ found Plaintiff not disabled.  (AR 25; see AR 18-25.)  He requested review from the Appeals Council (AR 119), but it denied his request (AR 1).  This action followed.

**III.  STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is "more than a mere scintilla but less than a preponderance."

2

Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."  Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's.  Id. at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of Social Security if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 404.1520(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.   § 404.1520(a)(4)(ii) & (c).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.   § 404.1520(a)(4)(iii) & (d).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform his past work; if so, the claimant is not disabled and the claim must be denied.   § 404.1520(a)(4)(iv).   The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257.   If the claimant meets that burden, a prima facie case of disability is established.   Id.

If that happens or if the claimant has no past relevant

---

[2] RFC is what a claimant can do despite existing exertional and nonexertional limitations.   § 404.1545(a)(1); see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).   The Commissioner assesses the claimant's RFC between steps three and four.   Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

1    work, the Commissioner then bears the burden of establishing that

2    the claimant is not disabled because he can perform other

3    substantial gainful work available in the national economy, the

4    fifth and final step of the sequential analysis.

5    §§ 404.1520(a)(4)(v), 404.1560(b).

6         B.   The ALJ's Application of the Five-Step Process

7         At step one, the ALJ found that Plaintiff had not engaged in

8    substantial gainful activity since June 11, 2013, the alleged

9    onset date.  (AR 20.)  His date last insured was December 31,

10   2019.  (Id.)  At step two, the ALJ determined that he had severe

11   impairments of "disorders of the back" and "arthritis."  (Id.)

12   At step three, he found that Plaintiff's impairments did not meet

13   or equal a listing.  (AR 21.)  At step four, he concluded that

14   Plaintiff had the RFC to perform a limited range of light work:

15        [He] can lift and/or carry 20 pounds occasionally and 10

16        pounds frequently.  He can stand and/or walk for six

17        hours of an eight-hour workday, and can sit for six hours

18        of an eight-hour workday, with normal breaks.  He can

19        bend, stoop, crouch and crawl occasionally.

20   (Id. (citing § 404.1567(b)).)  He could not perform his past

21   relevant work.  (AR 23.)  At step five, the ALJ found that

22   Plaintiff could perform jobs existing in significant numbers in

23   the national economy.  (AR 24.)  Accordingly, he found him not

24   disabled.  (AR 25.)

25

26

27

28

**V.   DISCUSSION**[3]

Plaintiff contends that the ALJ "impermissibly rejected [his] subjective symptom testimony." (J. Stip. at 4.)  For the reasons discussed below, the ALJ did not err.

A.   Applicable Law

An ALJ's assessment of a claimant's allegations concerning the severity of his symptoms is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended) (citation omitted); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24, 1986).  "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'"  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36; see also SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016).  First, the ALJ must determine whether the claimant has presented "objective medical evidence of an underlying impairment

_____

[3] In Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018), the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" and thus subject to the Appointments Clause.  To the extent Lucia applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during his administrative proceedings.  (See AR 31-42, 119-20, 182-83); Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended) (plaintiff forfeits issues not raised before ALJ or Appeals Council); see also Kabani & Co. v. SEC, 733 F. App'x 918, 919 (9th Cir. 2018) (rejecting Lucia challenge because plaintiff did not raise it during administrative proceedings), cert. denied, 139 S. Ct. 2013 (2019).

[that] could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter, 504 F.3d at 1036 (citation omitted).  If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Id. (citation omitted; emphasis in original).

If the claimant meets the first test, the ALJ may discount the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding or affirmative evidence of malingering, the ALJ must provide a "clear and convincing" reason for rejecting the claimant's testimony. Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended) (citing Lingenfelter, 504 F.3d at 1036); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014).  The ALJ may consider, among other factors, (1) the claimant's reputation for truthfulness, prior inconsistent statements, and other testimony that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties. See Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the ALJ's evaluation of a plaintiff's alleged symptoms is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas, 278 F.3d at 959.

1    In evaluating a claimant's subjective symptoms, the ALJ

2  considers "all of the available evidence" in the record,

3  § 404.1529(c)(1), including the "objective medical evidence,"

4  § 404.1529(c)(2), and "other evidence" from medical sources,

5  § 404.1529(c)(3).  Objective medical evidence is obtained through

6  "medically acceptable clinical and laboratory diagnostic

7  techniques."  § 404.1529(c)(2) (listing as examples "evidence of

8  reduced joint motion, muscle spasm, sensory deficit or motor

9  disruption").  "[O]ther evidence" is everything else relevant to

10  evaluating pain, including, for example, "medical opinions about

11  the individual's symptoms and their effects" and the

12  "longitudinal record of any treatment and its success or

13  failure."  SSR 16-3p, 2016 WL 1119029, at *6; <u>see</u>

14  § 404.1529(c)(3) (evidence from medical sources about what

15  precipitates or aggravates pain, medications or treatments

16  prescribed or used to alleviate it, and how it affects claimant's

17  daily life are all "other evidence").

18    Contradiction with the "objective medical evidence" is a

19  "specific and legitimate" basis for rejecting a claimant's

20  subjective symptom testimony.  <u>Morgan v. Comm'r of Soc. Sec.</u>

21  <u>Admin.</u>, 169 F.3d 595, 600 (9th Cir. 1999); <u>see</u> § 404.1529(c)(2).

22  But it "cannot form the sole basis for discounting" it.  <u>Burch v.</u>

23  <u>Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005); <u>Rollins v.</u>

24  <u>Massanari</u>, 261 F.3d 853, 857 (9th Cir. 2001) (applying earlier

25  version of § 404.1529(c)(2)).

26    B.  <u>Applicable Background</u>

27       1.  <u>Objective medical and other evidence</u>

28    Plaintiff reportedly hurt his right knee in 1998, when he

8

"slipped and fell" while "walking down the stairs" at work,
"twist[ing]" it.  (AR 353.)  He underwent ACL and meniscal repair
shortly thereafter (see AR 196, 353) and reportedly had a third
right-knee surgery in 2001 "because he re-tore his medial
meniscus" (AR 353).  While recovering from that operation, he
allegedly "heard a pop" in his left knee.  (Id.)  He has "worn
the knee sleeve ever since."[4]  (Id.)  His right-knee pain
allegedly "increased significantly" "[o]ver the years" and by
2013 he "could barely walk."  (Id.)

He also reportedly injured his back on March 31, 2009, when
he "lifted an over 50 pound bag to place in the dumpster,
twisted, and felt a burning pain and spasm in his low back."  (AR
1077; see AR 353.)  A lumbar-spine MRI taken May 8, 2009, showed
"[m]inimal desiccation at the L3/L4 disc level," "3mm broad-based
right lateral (foraminal/extraforaminal) disc protrusion," and
"right foraminal radial annular tear."  (AR 192-93.)
"Otherwise," the lumbar spine was "normal," and there was "no
evidence of significant central canal spinal stenosis nor nerve
compression."  (AR 193.)  By December 15, 2009, Plaintiff
reported to Nicole Minh-Nguyet Pham-Bailey,[5] his treating doctor,
that he had no lower-back pain and "could tolerate hiking 5 miles

---

[4] It is not clear on which knee Plaintiff wears the device.
In April 2016 he stated that he had worn it on the right "for 19
years" (AR 151) but apparently told the workers'-compensation
doctor that he wore it in response to a left-knee injury (see AR
353).

[5] Dr. Pham-Bailey primarily practices occupational medicine.
See Cal. Dep't Consumer Aff. License Search, https://
search.dca.ca.gov (search for "Pham-Bailey" under doctors'
licenses) (last visited Apr. 13, 2020).

on medium difficulty trail with no difficulty or pain."  (AR 1056.)  Dr. Pham-Bailey concluded that his lumbar strain was "resolved."  (<u>Id.</u>)

Plaintiff underwent a "routine physical examination" on March 11, 2013, a few months before his alleged onset date.  (AR 224.)  He reported "just . . . his normal pains in the right side of the body associated with the . . . shoulder, back and knee" joints.  (<u>Id.</u>)  He had "normal" motor skills, sensation, strength, and reflexes.  (AR 226.)

Plaintiff's "last day of work" was June 11, 2013, the alleged onset date (AR 353, 996), shortly after he had reportedly experienced "excruciating" pain and notified his supervisor that he could no longer work (AR 369).  He took "disability retirement" on February 28, 2014.  (AR 368; <u>see also</u> AR 129 (reporting earnings in 2014).)

On December 6, 2013, Plaintiff saw Andrew Miles, an orthopedist, for right-knee pain that "increase[d] with walking and prolonged standing," among other things.  (AR 483.)  He did not report back pain.  (<u>Id.</u>)  Dr. Miles diagnosed him with "[r]ight knee internal derangement" and opined that he could return to work immediately, provided he could "interchange between standing and sitting positions as needed for comfort,"[6] didn't lift more than 15 pounds, and had "limited" posturals (AR 484), an assessment he extended a number of times (<u>see, e.g.</u>, AR 490 (Jan. 10, 2014, increasing lifting to 20 pounds), 502 (Jan.

---

[6] A patient-status-report form completed by Dr. Miles the same day, listing his work limitations, did not include the sit-stand-at-will requirement.  (AR 482.)

10

24, 2014) (retaining 20-pound-lifting limitation)).

On July 8, 2014, John Beck, an orthopedic surgeon, evaluated Plaintiff for his workers'-compensation claim; he complained of "right knee pain that ha[d] been present since 1998," "intermittent pain" in his left knee, and "intermittent mid and lower back pain and spasms." (AR 352, 354.) He claimed to have "difficulty dressing and bathing," "riding and driving," and "standing[,] sitting, reclining, bending, pushing/pulling, walking, and climbing stairs." (AR 354-55.) He stated that he had no difficulty lifting or carrying. (Id.) Examination of the lumbar spine showed "normal" deep-tendon reflexes and "no swelling or ecchymosis,"[7] and he had somewhat diminished range of motion; upper-extremity "[s]ensation to light touch" was "normal," but the straight-leg-raising test[8] was "positive" on both legs. (AR 360.) "Examination of the knees revealed left knee swelling, effusion and crepitation." (Id.; see id. (noting that "[g]rinding was noted on the left knee").) He had "normal" range of motion in both knees. (Id.) Dr. Beck opined that he could sit "constant[ly]" — "6-8+" hours in an eight-hour day — and could stand or walk "1-3 hours" a day. (AR 426.)

Plaintiff saw Randy Rosen, a pain-management specialist (AR

---

[7] "Ecchymosis is the medical term for the common bruise." Understanding Ecchymosis, Healthline, https://www.healthline.com/health/ecchymosis (last visited Apr. 13, 2020).

[8] A straight-leg-raise test involves mechanical manipulation of the legs, stressing the neurological tissues in the spine; specific symptoms reported at different degrees of flexion can indicate nerve compression. See The Pain Clinic Manual 44-45 (Stephen E. Abram & J. David Haddox eds., 2d ed. 2000).

597), on July 10, 2014, for an "interventional pain management follow up evaluation" (AR 591).  He reported back pain — five to eight on a scale of 10 — that had "decreased since" a visit the previous month.  (AR 592.)  He had had a "bilateral L2 through L4 medial branch joint" injection[9] on June 21, 2014, resulting in "50% to 60% improvement" in his pain.  (Id.)  He also took Vicodin, which he found "very helpful."  (Id.)  On examination, he had mostly normal range of motion in his lumbar spine and fully intact sensation and lower-extremity muscle strength and reflexes.  (AR 594-95.)  Dr. Rosen noted that Plaintiff was "able to go into extension and lateral bending with greater ease and able to walk longer periods without any aggravation of his low back pain."  (AR 595.)

On August 24, 2014, Dr. Beck reviewed the May 2008 lumbar-spine MRI, which "confirm[ed]" to him that the lumbar area was "the source of [Plaintiff's] back pain."  (AR 348.)

Walter Burnham, an orthopedic surgeon (AR 432), completed a "secondary treating physician's orthopedic followup with request for authorization for lumbar spine surgery" on October 24, 2014 (AR 429).  He "believe[d] that on each visit [Plaintiff's] complaints and physical examination [had] been consistent."  (Id.)  He noted "instability" and "limited range of motion" in the lumbar spine (AR 430); Plaintiff had full motor strength and

---

[9] A lumbar facet-joint injection "involves injecting a small amount of local anesthetic (numbing agent) and/or steroid medication, which can anesthetize the facet joints and block the pain."  Ray Baker, Cervical, Thoracic and Lumbar Facet Joint Injections, Spine-health, https://www.spine-health.com/treatment/injections/cervical-thoracic-and-lumbar-facet-joint-injections (last visited Apr. 13, 2020).

sensation in the lower extremities, however (see id.; see also AR 431 (noting that Plaintiff probably had not been authorized for surgery in part because he had "no motor or sensory deficits of lower extremity")).  Dr. Burnham ordered "some diagnostic imaging" and stated his intention to "continue to support the fact that he is disabled" by his L3-L4 lumbar degeneration.  (AR 431.)  He predicted with a "high degree of certainty" that Plaintiff would "improve with operative intervention."  (Id.)  A November 4, 2014 lumbar-spine x-ray in flexion and extension showed "Grade I" spondylolisthesis[10] at L3-L4.  (AR 614.)

Dr. Miles prescribed a knee brace on February 9, 2015.  (AR 638.)

A May 12, 2015 preoperative lumbar-spine x-ray again showed "[m]ild degenerative disc disease at L3-L4" with Grade I spondylolisthesis.  (AR 900.)  Dr. Burnham performed spinal fusion at L3-L4 on May 19, 2015.  (AR 914-15.)  There were no complications.  (AR 915.)

Dr. Beck conducted another workers'-compensation evaluation on February 13, 2016.  (AR 994.)  Plaintiff reported "continued low back pain," although it had "improved" since the surgery; he also had "right knee pain."  (AR 996.)  On examination of the lumbar spine, his deep-tendon reflexes were "normal" and there was "no swelling or ecchymosis."  (AR 1000.)  "[L]umbar spasms"

---

[10] Spondylolisthesis is measured in five "grades," based on the amount of vertebral slippage; "grade I" denotes zero to 25 percent slippage.  William C. Shiel Jr., Spondylolisthesis, eMedicineHealth, https://www.emedicinehealth.com/spondylolisthesis/article_em.htm#what_causes_spondylolisthesis (last visited Apr. 13, 2020).

and "[g]ross tenderness" were noted.  (<u>Id.</u>)  The straight-leg-raising test was "positive from a supine position at 65 degrees in the left and 55 degree[s] on the right and from seated bilaterally."  (<u>Id.</u>)  Upper-extremity "[s]ensation to light touch" was "normal."  (<u>Id.</u>)  He had partially diminished range of motion of the lumbar spine.  (AR 1000.)  Dr. Beck anticipated that Plaintiff would "reach[] maximum medical improvement one year following the spinal fusion at L3-L4, in May 2016."  (AR 1016.)

Richard Pollis, an orthopedic surgeon (AR 652), conducted a "complete orthopaedic evaluation" at Defendant's request on June 14, 2016 (AR 648).  Plaintiff reported that he could walk for "30 minutes at a time," must "change position after sitting for 1 hour," could lift 20 pounds, and needed to "limit lifting, carrying, pushing, [and] pulling."  (<u>Id.</u>)  He wore a knee brace.  (<u>Id.</u>)  On lumbar examination he had limited range of motion in flexion, extension, and on lateral bending, and there was "paravertebral muscle spasm and tenderness present."  (AR 650.)  The straight-leg-raising test was "[l]imited to 80 degrees with hamstring spasms, bilaterally."  (<u>Id.</u>)  The doctor noted tenderness on the right knee and limited range of motion "with pain and crepitations."  (AR 651.)  Motor strength was "grossly within normal limits," and sensation was "[n]ormal in both upper and lower extremities."  (<u>Id.</u>)  Based on Plaintiff's history and the physical examination, Dr. Pollis concluded that he

> can lift and carry 20 pounds occasionally and 10 pounds frequently.  He can stand and walk 6 hours in an 8-hour workday with appropriate breaks, and sit 6 hours in an

14

1    8-hour workday with appropriate breaks.  Pushing and

2    pulling with the lower extremities are limited to

3    occasional.  Posturally, [he] is able to bend, stoop,

4    crouch and climb occasionally.

5  (AR 652.)

6        State-agency doctor H. Pham[11] reviewed Plaintiff's records

7  on June 23, 2016, and agreed that he could perform light work

8  with postural limitations.  (AR 51-52.)

9        On April 27, 2017, Plaintiff was evaluated by Robert Horner,

10  an orthopedic surgeon, in connection with his workers'-

11  compensation claim.  (AR 1019.)  He complained of lower-back pain

12  that increased when he lifted, pushed, or pulled more than 20

13  pounds and with bending and stooping, "prolonged sitting and

14  standing," or sitting "without the use of an armrest."  (AR

15  1023.)  His symptoms were relieved by rest, heat application,

16  medication, and his TENS unit.[12]  (Id.)  "Overall, his low back

17  symptoms [had] improved" since surgery (id.): examination of the

18  lumbar spine showed "no evidence of paravertebral muscle spasm"

19  or "tenderness along the spinous processes," but there was

20

21        [11] Dr. Pham's electronic signature includes a medical-
22  specialty code of 19, indicating internal medicine.  (AR 55); see
   Soc. Sec. Admin., Program Operations Manual System (POMS) DI
23  24501.004 (May 5, 2015), http://policy.ssa.gov/poms.nsf/lnx/
   0424501004.
24
        [12] "A transcutaneous electrical nerve stimulation (TENS)
25  unit is a battery-operated device" that treats pain "by
   delivering small electrical impulses through electrodes that have
26  adhesive pads to attach them to a person's skin."  What is a TENS
   unit and does it work?, MedicalNewsToday, https://
27  www.medicalnewstoday.com/articles/323632 (last visited Apr. 13,
28  2020).

"slight tenderness to palpation over the bilateral paraspinal muscles" (AR 1028).  The straight-leg-raising test was "negative at 65 degrees on the right and 70 degrees on the left," and there was "no evidence of decreased sens[itivity]" and "no gross weakness."  (Id.)

Plaintiff also complained to Dr. Horner of "constant sharp pain" in the right knee and "buckling and locking episodes," requiring the knee to be "popped back in place."  (AR 1023.)  His symptoms increased with "prolonged standing and walking," "bending," "driving" for more than an hour, "lifting more than 25 pounds," "navigating stairs and inclines," and with cold weather.  (Id.)  Rest, elevation, heat, pain medication, and the TENS unit "help[ed] reduce his symptoms," which he felt were "worse[ning]."  (Id.)  He also complained of "sharp pain" in his left knee that responded to rest and medication.  (Id.)  On examination, he had full range of motion in both knees.  (AR 1029.)

Overall, Dr. Horner concluded that Plaintiff should be precluded from "heavy lifting, repetitive bending, stooping, kneeling, squatting and stair climbing," and "prolonged weight-bearing" and "should be off his feet for 20 minutes once or twice an hour."  (AR 1082.)  With these restrictions, he could return to work immediately "on a part-time basis and gradually return to work full-time."  (Id.)

2.   Plaintiff's statements and testimony

In a questionnaire dated April 27, 2016, Plaintiff stated that his "back and knee pain" prevented him from "sitting, standing, or walking for long periods of time."  (AR 149.)  He experienced back pain when he "tr[ied] to do regular daily

16

activities" and when he "ben[t]" or "twist[ed]"; his right knee
hurt after "spend[ing] long periods of time on [his] feet and
when [he] squat[ted]." (<u>Id.</u>)  Although he "tr[ied] to walk
whenever possible," the more he did, "the greater the pain [was]
in [his] back and right knee." (<u>Id.</u>)  He could climb stairs
"hold[ing] the rail, if available," although "slowly." (AR 150.)
He had been wearing a brace on his right knee "for 19 years."
(AR 151.)  He reported "some improvement since spinal fusion
surgery." (<u>Id.</u>)

At the March 5, 2018 hearing, Plaintiff testified that in
June 2013, while working for LAUSD, he "experienced severe pain
in [his] back" and knee. (AR 33.)  He informed his supervisor,
who "sent [him] to the workers' comp doctor" and "took [him] off
work." (<u>Id.</u>)  His workers'-compensation case was "still
pending." (AR 34.)  He testified that since the injury he had
"[l]imited strength" and "a lot of pain" when bending. (<u>Id.</u>)  He
had problems "lift[ing] and carry[ing]." (<u>Id.</u>)  His right knee
"bother[ed]" him when he used stairs, lifted, or reached. (<u>Id.</u>)
He estimated that he could lift "about 20, 25 pounds." (<u>Id.</u>)  He
could stand "one or two hours at a time" followed by "30 minutes"
or "an hour" of rest and "sit comfortabl[y]" for "maybe 30, 45
minutes" before needing to "[g]et up and walk around" for 10 or
15 minutes to "stretch out." (AR 35.)  He also had an "issue"
with his right shoulder, namely, "a lot of pain" and "limited
mobility," although he "seem[ed] to manage" it. (<u>Id.</u>)

### 3.   The ALJ's decision

The ALJ found Plaintiff's "statements about the intensity,
persistence, and limiting effects" of his symptoms "partially

1  consistent with the treatment records." (AR 22.)

2       The ALJ first considered the objective medical evidence

3  supporting Plaintiff's claims of lower-back pain, noting that

4  although Dr. Beck found degenerative changes to be the "source of

5  [his] back pain," the 2015 lower-back x-ray showed only "mild

6  degenerative disc disease." (Id.) Moreover, he "had not yet

7  been authorized for spinal surgery because he had no motor or

8  sensory deficits" in his lower extremities. (Id.) The ALJ also

9  considered the progress of Plaintiff's conditions over time,

10 noting that Dr. Burnham had "anticipated 'with a high degree of

11 certainty' that [Plaintiff] would improve with surgery" and that

12 Plaintiff had had L3-L4 fusion in May 2015. (Id.) And although

13 Dr. Pollis had found some continuing symptoms in June 2016, the

14 straight-leg-raising test was negative to 80 degrees

15 bilaterally.[13] (Id.) He accordingly concluded that although

16 Plaintiff's lower-back impairment "produced symptoms even after

17 the 2015 surgery," he was nonetheless capable of "less than the

18 full range of light work." (Id.)

19      The ALJ considered the longitudinal treatment record for

20 Plaintiff's knee pain, noting specifically that the knee

21 surgeries were "remote." (Id.) He noted that in 2016,

22 approximately 15 years after the most recent such surgery, Dr.

23 Pollis had observed only a "well-healed scar" and some

24 tenderness. (Id.) Objectively, Plaintiff had "range of motion

25 to 130 degrees in the right knee, with pain and crepitations";

26

27          [13] The ALJ stated that there was "no positive straight leg
   test in evidence" (AR 22), but there were two (AR 360 (July
28 2014), 1000 (Feb. 2016)).

                                   18

"[t]he left knee was observed as normal." (AR 23.) Overall, the ALJ concluded that the "persistence of symptoms related to degenerative changes in the knee support[ed] a finding of limitations related to the performance of postural movements." (Id.)

The ALJ also discussed the medical-opinion evidence, including the opinions of Dr. Pollis and Dr. Pham, who opined that Plaintiff could perform light work with additional limitations. (Id.) He gave those opinions "significant weight" because they were "consistent with the totality" of the record evidence. (Id.) Ultimately, he agreed with both doctors that Plaintiff's symptoms "would limit him to less than the full range of light work." (AR 22 (implicitly discounting Plaintiff's statements concerning his lower back); see AR 23 (finding objective evidence and other medical evidence "consistent with" light-work RFC and discounting statements concerning knee accordingly).)

C.   Analysis

As an initial matter, the ALJ largely accepted Plaintiff's self-reported limitations in finding that he was capable of less than the full spectrum of light work. Indeed, Plaintiff's complaints mostly concerned increased pain when performing posturals (see AR 34 (reporting "a lot of pain" when bending), 149 (reporting increasing pain with bending, twisting, and squatting)), and the ALJ found limitations "relat[ing] to the performance of postural movements" (AR 23), limiting him to only "occasional[]" such activity (AR 21). Similarly, Plaintiff's testimony that he could lift "about 20, 25 pounds" (AR 34) is not

19

inconsistent with light work.  <u>See</u> § 404.1567(b) (light work
requires "lifting no more than 20 pounds at a time").  In finding
his statements only "partially consistent" with the treatment
records (AR 22), the ALJ implicitly rejected only his allegations
that he needed "30 minutes" to "an hour" of rest after standing
for "one or two hours" and that he could sit for "maybe 30, 45
minutes" before he needed to "[g]et up and walk around."  (AR
35); <u>cf.</u> § 404.1567(b).

To the extent he discounted Plaintiff's subjective symptoms,
he provided clear and convincing reasons supported by substantial
evidence for doing so.  First, he properly concluded that
Plaintiff's claims were inconsistent with the objective medical
evidence (<u>see</u> AR 22), which is a valid basis for discounting a
claimant's subjective symptom testimony.  <u>Morgan</u>, 169 F.3d at
600; § 404.1529(c)(2).  Second, the ALJ considered "other
evidence" from Plaintiff's medical sources, including evidence of
the "longitudinal record of any treatment and its success or
failure," SSR 16-3p, 2016 WL 1119029, at *6 (Mar. 28, 2016);
§ 404.1529(c)(3) (evidence from medical sources about treatments
prescribed or used to alleviate pain is not "objective medical
evidence"), and the doctors' opinions.

For example, contrary to Plaintiff's claims of disabling
back pain (<u>see</u> AR 34-35, 149-50), the objective medical evidence
indicated that his lumbar degeneration was mild, even before the
May 2015 surgery.  The November 2014 and May 12, 2015 lumbar-
spine x-rays showed only "mild," "Grade I" degeneration at L3-L4
(AR 614, 900), as the ALJ specifically observed (AR 22 ("A 2015
x-ray showed mild degenerative disc disease.")).  That level of

1  degeneration did not manifest severe symptoms: at the July 10,
2  2014 examination, Plaintiff had mostly normal range of motion in
3  his lumbar spine and retained full sensation, strength, and
4  reflexes in his lower extremities. (See AR 594-95; see also AR
5  360 (Dr. Beck finding "normal" upper-extremity sensation in July
6  2014), 431 (Dr. Burnham noting in Oct. 2014 that Plaintiff had
7  not been approved for surgery because he had "no motor or sensory
8  deficits" in lower extremities).)

9      As to the other evidence, the treatment records demonstrated
10 that Plaintiff's pain was receptive to treatment. (See AR 592
11 (Plaintiff reporting in July 2014 that injection provided 50 to
12 60 percent improvement in pain and that pain medication for
13 residual pain was "very helpful"); see also AR 22 (ALJ finding
14 Plaintiff's statements inconsistent with "treatment records").)
15 Indeed, it substantially eliminated his pain-related limitations.
16 (See, e.g., AR 354 (Plaintiff reporting in July 2014 that he had
17 no difficulty lifting or carrying), 595 (Dr. Rosen observing in
18 July 2014 that Plaintiff was "able to go into extension and
19 lateral bending with greater ease and able to walk longer periods
20 without any aggravation of his low back pain").) Notably, Dr.
21 Miles opined in July 2014 that Plaintiff could sit "constantly,"
22 for "6-8+" hours without interruption (AR 426), directly
23 contradicting Plaintiff's claim that he couldn't (see AR 355
24 (stating to Dr. Beck in July 2014 that he could sit "for 30
25 minutes to one hour"); cf. id. (claiming he could sit "for two
26 hours"); see also AR 35 (claiming at hearing that he could sit
27 comfortably for "maybe 30, 45 minutes")).

28     And as the ALJ recounted (see AR 22), Dr. Burnham found in

1    2014 that Plaintiff's pain and limitations were entirely
2    attributable to his L3-L4 degeneration and predicted — with a
3    "high degree of certainty" — that those symptoms would "improve"
4    with surgery (AR 431; see also AR 1016 (Dr. Beck anticipating in
5    Feb. 2016 that Plaintiff would "reach[] maximum medical
6    improvement . . . in May 2016")).  The ALJ then concluded that
7    Plaintiff's mild limitations had been further, although not
8    entirely, alleviated by the May 2015 surgery.  (See generally AR
9    22 (noting that Plaintiff continued to experience some pain "even
10   after the 2015 surgery" but was capable of "less than the full
11   range of light work" notwithstanding extant symptoms).)

12          That finding is supported by the record.  Plaintiff himself
13   reported "some improvement since spinal fusion surgery."  (AR 151
14   (Apr. 2016 questionnaire); see AR 996 (Plaintiff reporting
15   "improved" back pain in Feb. 2016).)  Similarly, the straight-
16   leg-raising test, "positive" in 2014 (AR 360), was "negative" in
17   2016 (AR 1028 (Apr. 2016 test negative to 65 degrees on right and
18   70 on left)), as the ALJ noted (AR 22).[14]  And as before the
19   surgery, Plaintiff exhibited few if any signs of severe
20   degeneration or nerve impingement (see, e.g., AR 651 (Dr. Pollis
21   finding motor strength "grossly within normal limits" and motor
22   sensation "[n]ormal in both upper and lower extremities" in June
23   2016), 1028 (Dr. Horner finding "no evidence of decreased
24   sens[itivity]" and "no gross weakness" in Apr. 2017)) and

25

26          [14] Although Dr. Beck noted a positive straight-leg-raising
27   test in February 2016 (AR 1000), he also anticipated that
     Plaintiff would not fully recover from surgery until May 2016
28   (see AR 1016).

continued to experience relief from his pain medication (see AR 1023 (reporting pain relief from "rest, heat application, medication, and TENS unit" in Apr. 2017)).

Plaintiff's claims of "severe" knee pain since approximately 2013 (AR 33) are similarly inconsistent with the treatment records. The injuries and corrective procedures he reported were "remote," as the ALJ noted. (AR 22); see SSR 16-3p, 2016 WL 1119029, at *6 (information in medical records about onset of symptoms, their change over time, and plaintiff's self-reported activities not objective medical evidence); § 404.1529(c)(3). Apart from evidence that he was prescribed and wore a knee brace (see AR 638 (Dr. Miles prescribing "knee brace" in Feb. 2015), 648 (Dr. Pollis noting in June 2015 that he wore right-knee brace "[a]t the present time"); cf. AR 151 (claiming in April 2016 that he had worn knee brace "for 19 years")), there is no evidence he required any specialized treatment on the knee after 2001, including after he applied for workers' compensation in July 2013 claiming suddenly "severe" knee pain (see AR 33, 353).[15]  In any event, the ALJ apparently accepted Plaintiff's claims regarding his knee. (See AR 23 (noting certain "persisten[t]" symptoms "related to degenerative changes in the knee" and adopting certain "limitations related to the performance of postural movements").)[16]

---

[15] Although he complained of "sharp pain" in the knee in April 2017 (AR 1023), examination revealed no irregularities apart from a surgery scar (see AR 1029).

[16] Plaintiff also claimed that his knee caused him difficulty when "lifting" but testified that he could lift 20 to
(continued...)

1    Finally, the ALJ considered the postoperative medical-
2 opinion evidence,[17] which showed that Plaintiff was capable of
3 light work with additional limitations.  (See AR 23; see also AR
4 51, 652.)  In granting those opinions "significant weight" (AR
5 23) — a finding Plaintiff has not challenged — the ALJ implicitly
6 discounted Plaintiff's subjective symptoms to the limited extent
7 they were inconsistent with them.  (See AR 22); see also
8 Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989) (court may
9 draw "specific and legitimate inferences from the ALJ's
10 opinion").  This, too, was proper.  See Molina, 674 F.3d at 1113
11 (examining doctor's opinion that condition "was not severe" and
12 could be "controlled" was "specific, clear, and convincing
13 reason[]" to reject subjective symptom testimony); Moncada v.
14 Chater, 60 F.3d 521, 524 (9th Cir. 1995) (per curiam) (examining
15 doctor's assessment that plaintiff "could do sedentary work" was
16 "specific" and "valid" reason to reject his "claims of excessive
17 pain").

18    Notably, Plaintiff does not identify any record evidence
19 undermining the ALJ's discounting of his subjective symptom
20 statements as only "partially consistent" with the treatment
21 records.  (AR 22; see generally J. Stip. at 4-10.)  Instead, he
22 contends that the ALJ "did not articulate a single sufficient
23 rationale" for discounting them, arguing that his stated reasons

24

25    [16] (...continued)
   25 pounds (AR 34), not inconsistent with performing light work.
26 See § 404.1567(b).

27    [17] As noted, medical-opinion evidence is not objective
   medical evidence.  See SSR 16-3p, 2016 WL 1119029, at *6;
28 § 404.1529(c)(3).

were insufficient under <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 345
(9th Cir. 1991) (en banc).  (J. Stip. at 6; <u>see id.</u> at 6-7.)
Although Plaintiff is correct that subjective pain testimony
cannot be rejected on the sole basis that it is not fully
corroborated by objective medical evidence, <u>see Burch</u>, 400 F.3d
at 680 (citing <u>Bunnell</u>, 947 F.2d at 345); § 404.1529(c)(2), the
ALJ did not discount his symptoms solely on that basis.  He also
found them inconsistent with "other evidence" in the medical
records and with the medical-opinion evidence.  (<u>See, e.g.</u>, AR 22
(finding symptoms inconsistent with "treatment records").)  The
ALJ's holistic consideration of the treatment records beyond
simply the "objective medical evidence" in them was proper.  <u>See</u>
§ 404.1529(c)(2) & (3); <u>George v. Berryhill</u>, No.
1:16-cv-00335-GSA, 2017 WL 3383117, at *11 (E.D. Cal. Aug. 7,
2017) (ALJ properly discounted symptoms given lack of "objective"
medical evidence under § 404.1529(c)(2) and inconsistences with
other medical "opinions and observations" about plaintiff's
symptoms under § 404.1529(c)(3)).  And although Plaintiff claims
that the ALJ made "no attempt to provide specific, clear, and
convincing reasons for his credibility determination beyond the
routine language" (J. Stip. at 6), his decision, as discussed,
reflects a careful reading of all of the evidence, including the
trajectory of Plaintiff's symptoms before and after his surgeries
(<u>see</u> AR 22-23).

Plaintiff cites "the fact [he] underwent" back surgery as
evidence "that he has sought out and underwent non-conservative
modes of treatment." (J. Stip. at 8.)  But the ALJ did not
discount his allegations on that basis (<u>see</u> AR 22), as Plaintiff

concedes (<u>see</u> J. Stip. at 7), and his willingness to have back surgery therefore does not undermine the ALJ's reasoning.  <u>See</u> <u>Arlene R.M. v. Comm'r of Soc. Sec.</u>, No. 17-CV-370-FVS, 2019 WL 267912, at *5 (E.D. Wash. Jan. 18, 2019) (rejecting plaintiff's argument that her credibility was "bolstered" by other evidence when she "fail[ed] to address the reasons cited by the ALJ or demonstrate any error").  Plaintiff also discusses his daily activities at length (<u>see</u> J. Stip. at 8-10) even though he concedes that the ALJ did not discount his testimony as inconsistent with them (<u>see</u> <u>id.</u> at 9 (acknowledging that ALJ did not "articulate [his] daily activities . . . as rationale to reject his testimony")).  Because the ALJ indeed did not discount Plaintiff's testimony on that basis, the Court declines to address those arguments.

The ALJ stated clear and convincing reasons, supported by substantial evidence, to partially discount Plaintiff's subjective symptom testimony.  Reversal is not warranted.

**VI.   CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[18] IT IS ORDERED that judgment be entered AFFIRMING the Commissioner's decision, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.

DATED: April 20,2020

*Jan Rosenbluth*

JEAN ROSENBLUTH
U.S. MAGISTRATE JUDGE

---

[18] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."